BLACKWELL v. ST. LOUIS, B. & M. RY. CO. (No. 5315.)

(Court of Civil Appeals of Texas. San Antonio. June 17, 1914.)

1. CARRIERS (§ 228*) — SHIPMENT OF LIVE STOCK—ACTIONS FOR DAMAGES—EVIDENCE.

In an action against a carrier for damages to a shipment of live stock, evidence *held* insufficient to show any unreasonable delay in transportation, or that any of the cattle died en route as alleged.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 957–960; Dec. Dig. § 228.*]

2. EVIDENCE (§ 545*) — EXPERT TESTIMONY — QUALIFICATION OF EXPERTS.

Witnesses testifying as experts must show their qualification to so testify or their testimony may be disregarded.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2360–2362; Dec. Dig. § 545.*]

3. APPEAL AND ERROR (§ 1001*)—REVIEW—QUESTIONS OF FACT.

In an action for damages to a shipment of live stock, tried by the court sitting as a jury, where unreasonable delay in transportation is not so clearly shown that reasonable minds would not differ thereon, the trial court's finding will not be disturbed.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3922, 3928–3934; Dec. Dig. § 1001.*]

Appeal from Cameron County Court; E. H. Goodrich, Judge.

Action by D. A. Blackwell against the St. Louis, Brownsville & Mexico Railway Company. From a judgment for defendant, plaintiff appeals. Affirmed.

Kinder & Williams and Ira Webster, all of Brownsville, for appellant. Graham, Jones, West & Dancy and J. C. George, all of Brownsville, for appellee.

CARL, J. Appellant, D. A. Blackwell, sued the St. Louis, Brownsville & Mexico Railway Company, appellee, and alleged that on or about February 20, 1913, he delivered 322 head of cattle, and appellee accepted same at Brownsville, Tex., to be safely carried to Houston, Tex., with ordinary care, and with reasonable diligence and speed; there to be by the railway delivered to the Houston Packing Company, "for a reasonable reward, paid or to be paid on the delivery thereof as aforesaid." It is alleged that the railway did not deliver said cattle to the Houston Packing Company with reasonable diligence and speed, as it was in duty bound to do, but neglected and refused to do so; that the cattle were delayed 58 hours longer than the ordinary time required to make such shipment and delivered; that by reason of such delay the cattle shrunk in weight 50 pounds per head more than the shrinkage would have been if the cattle had been transported with reasonable promptness and care, and that by reason thereof appellant was damaged in the sum of $2 per head, same being four cents per pound for the alleged excessive shrinkage.

The petition further charges that two of the cattle, worth $21.60 each, died en route as a result of careless handling and delay in shipment. The total damage claimed is $682.60. It is also alleged that the cattle were in good condition when shipped and in bad condition when received, as above indicated, and that the delay in shipment and negligent and careless handling caused the damage and loss.

The railway company filed a number of special exceptions, as well as a general demurrer, and made specific denial of the allegations, and charges that, when the cattle were received, they were of an inferior grade, were weak and emaciated by reason of the fact that they had been driven from Mexico to Brownsville, and were in need of food, and were not worth $21.60 per head, and pleaded a written contract of shipment, which contains the following clauses:

"* * * And the party of the first part covenants and agrees that the freight charge from point of shipment to final destination shall only be the sum of $ff, the same being a through rate lower than the local rates which might be lawfully charged by the party of the first part, and for and in consideration of which through rate and the guaranty thereof by the party of the first part hereby covenants and agrees as follows:

"First. That he does hereby release said party from any and all liability for delay in shipping said stock after delivery thereof to its agent, and from any delay in receiving same after being tendered to its agent.

"Second. That he does accept for transportation of said stock the cars tendered him by party of the first part, and agrees that they are in all things satisfactory to him, and he hereby assumes all risk of injury which the animals, or either of them, may receive in consequence of any of them, being wild, unruly, or weak, or of their maiming each other or themselves, or in consequence of heat or suffocation, or other ill effects of being crowded in the cars, or on account of being injured by the burning of hay, straw or other material used by the person or persons in charge of said stock for feeding or bedding said stock, or otherwise, and all risks of escape or robbery of said stock, or of loss or damage from any other cause or thing not resulting from the negligence of the agents of the first party; said negligence not to be assumed, but to be proved by the party of the second part.

"Third. That the party of the second part will load, unload, and reload said stock at his own risk, and feed, water, and attend to the same at his own expense and risk while it is in the stockyards of the party of the first part awaiting shipment and while on cars, or at feeding or transfer points, or where it may be unloaded for any purpose.

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

"Fourth. The party of the second part will see that said stock are securely placed in cars furnished, and that the cars are safely and properly fastened, so as to prevent the escape of said stock therefrom.

"Fifth. That, in case the party of the first part shall furnish laborers to assist in loading and unloading said stock at any point, such laborers shall be subject to the orders of the person representing the shipper in charge of said stock, and shall be deemed employés of the party of the second part while so assisting.

"Sixth. That, in case the party of the first part should for any reason undertake to water and feed said stock, it shall not be liable for insufficient supplies, nor for the imperfect discharge of said undertaking; it being expressly understood that the same is not a duty imposed upon it as a carrier of said stock.

"Seventh. And the party of the second part further agrees that, as a condition precedent to his right to recover any damage for any loss or injury to said stock, he or his agent, the person in charge of said stock, shall give notice in writing to his claim therefor, and the full amount of such loss or damage, to the station agent of the party of the first part at the station hereinbefore named as the end of the line of the party of the first part before said stock is removed from the station, and before said stock is mingled with other stock or delivered to any connecting line or railroad."

This contract was executed in duplicate and signed by both the railway and appellant.

In reply, by way of supplemental petition, plaintiff below alleged that the contract showed upon its face that the matter to which it relates was an intrastate shipment, and that the regular tariff rate of freight was charged, and that the provisions of the contract relate to an interstate shipment. Therefore it is contended that the first, third, and fourth clauses are provisions undertaking to limit the railway's common-law liability, are without consideration and are contrary to law and public policy, and are null and void.

The trial was before the court, and judgment was in favor of the railway company. [1-3] As to delay in shipment, the evidence shows that the cattle left Brownsville at 10 o'clock at night, February 20, 1913, and arrived in Houston at 5:05 p. m. February 23, 1913. There is no testimony showing that the stops were unreasonable, and the evidence fails to show what time would be necessary to properly water and feed such a shipment of cattle. Charley Butennari went with the shipment. He says they stayed an hour or two at Kingsville, proceeded to Bay City, and stayed from 3 or 4 o'clock in the morning until 3 or 4 o'clock the following morning. They were reloaded about 3 o'clock the next morning, and the evidence fails to show that the stop was unreasonable. The entire journey required about 67 hours, 24 of which was spent in feeding and watering. The trial court heard the evidence on the issue of delay and found against appellant. Even the evidence given by appellant would leave it doubtful as to whether there was an unreasonable delay and what time would ordinarily be required to transport and deliver the cattle from Brownsville to Houston. No one says that the stops made were not necessary. They were not fat cattle; rather thin Mexican cattle. He says that in his judgment a strong, healthy steer, if properly handled, would shrink about 50 pounds in weight from Brownsville to Houston. These cattle were "cutters"; that is to say, next in grade to "canners," which is the lowest grade. Appellant says he could not say what the shrinkage would be if kept longer on the road than 50 to 58 hours. "We all know they would shrink more, but we can hardly say what it will be." He gives an estimate of the weight of the cattle at point of shipment, but says it is simply a guess. Witnesses who propose to testify as experts should show their qualification to so testify, otherwise the court may disregard same. We know of no rule of law that gives guesswork any standing as evidence. St. L., I. M. & S. Ry. Co. v. Boshear, 108 S. W. 1034; T. & N. O. Ry. Co. v. Farrington, 40 Tex. Civ. App. 205, 88 S. W. 889; G., C. & S. F. Ry. Co. v. Kimble, 49 Tex. Civ. App. 622, 109 S. W. 234. None of the witnesses attempted to say that they knew what would be the time reasonably necessary to make the shipment. Appellant says he has since made shipments, but he does not show similar time, conditions, etc. The case was tried by the court sitting as a jury, and, where the unreasonable delay charged is not so clearly shown that reasonable minds would not differ thereon, the court's finding will not be disturbed. St. L., etc., Ry. Co. v. Rainey, 100 Tex. 48; 94 S. W. 321. The first and second assignments are overruled.

As to two head that it is claimed died in transit, the evidence is insufficient. He does not sue for failure to deliver two cattle which were delivered to the railway. He says in his petition they died en route. But there were no dead cattle in the shipment which arrived in Houston, for there were only 320 that reached the destination. Charley Butennari went with the shipment in charge, caring for the cattle, and he says nothing about any cattle dying en route. If appellant expects to recover for two head that died as a result of careless handling and delay, he should be able to show that the cattle did in fact die. It will be borne in mind he does not sue for failure to deliver the same number received, but the allegation is that they died en route. What became of the two head is not for us to say; but it might be suggested that there was a miscount at one end or the other, or they may have escaped from the feed pens. This, of course, is speculation, but no more unlikely to have happened than that the two head of cattle died en route, and neither the man in charge, sent by appellant, nor any one else knew anything about it. No one attempts to say that there were any dead ones in the shipment, not even Butennari, the agent of appellant who accompanied the shipment; and this part of the cause of ac-

tion is for two head that died by reason of rough handling. Where is the evidence that they died? We look to the record in vain to find it.

The judgment is in all things affirmed.